HOLDREN v LEASE MANAGEMENT, INC.

1. WORKMEN'S COMPENSATION—JOINT EMPLOYERS—JOINT LIABILITY—
   SIMULTANEOUS CONTROL—SIMULTANEOUS SERVICES—RELATED
   SERVICES.

   Joint employment, for which both employers are liable for work-
   men's compensation claims occurs when a single employee,
   under contract to two employers and under the simultaneous
   control of both, simultaneously performs services for both
   employers, and when the service for each employer is the same
   as, or is closely related to, that for the other.

2. WORKMEN'S COMPENSATION—DUAL EMPLOYMENT—SEVERABLE AC-
   TIVITY—LIABILITY—SEPARATE CONTROL—SEPARATE SERVICES—
   UNRELATED SERVICES.

   Dual employment, for which both employers may be liable for
   workmen's compensation claims, separately or jointly, depend-
   ing on the severability of the employee's activity at the time of
   injury, occurs when a single employee under contract with two
   employers, and under the separate control of each, performs
   services separately for the most part for each employer and the
   service for each is largely unrelated to that for the other.

3. WORKMEN'S COMPENSATION—JOINT EMPLOYMENT—SUPERVISION—
   APPROVAL—JOINT LIABILITY.

   An employee under contract to two employers was jointly em-
   ployed for workmen's compensation purposes and the co-em-
   ployers are each liable for workmen's compensation benefits to
   the employee where the employee's activity at the time of the
   accident served both the employers, the employee was not
   directly or intensively supervised by either employer, and each
   employer knew of and approved of his work for the other.

4. WORKMEN'S COMPENSATION—JOINT EMPLOYMENT—UNEQUAL SER-
   VICES—ADJUSTED LIABILITY.

   The workmen's compensation liability of joint employers may be

REFERENCES FOR POINTS IN HEADNOTES
[1-4] 58 Am Jur, Workmen's Compensation § 341.
[5] 58 Am Jur, Workmen's Compensation § 186.
[6] 58 Am Jur, Workmen's Compensation § 306.
[7] 58 Am Jur, Workmen's Compensation § 484 (supp).

adjusted accordingly where the payments made or services received by the joint employers to an injured employee were unequal.

5. WORKMEN'S COMPENSATION—DEPENDENCY BENEFITS—AGE OF DEPENDENTS—STATUTES.

An amendment to the Workmen's Compensation Act which reduced from 21 to 18 the age of a dependent, for payment of dependency benefits to injured employees, does not mandate a reduction of benefits to an employee whose dependent children were minors at the time of the employee's injury but who were over 18 years of age when the amendment became effective (MCLA 418.353).

6. WORKMEN'S COMPENSATION—BENEFITS—STATUTES—PART-TIME EMPLOYMENT—REDUCTION OF BENEFITS—COMPUTATION.

A partially incapacitated employee who receives the maximum statutory benefit under the Workmen's Compensation Act and who takes a part-time job will not have his benefits reduced where 2/3 of the difference between his average weekly wages before the injury and the average weekly wages which he is able to earn thereafter is still greater than the maximum workmen's compensation benefit permitted by statute (MCLA 418.361).

7. WORKMEN'S COMPENSATION—OVERDUE BENEFITS—INTEREST RATE.

Interest is payable at five percent on overdue benefits under the Workmen's Compensation Act, subject to amendment to six percent in the event the Supreme Court fixes that rate in a pending appeal.

Appeal from Workmen's Compensation Appeal Board. Submitted Division 3 March 4, 1975 at Grand Rapids. (Docket No. 21087.) Decided May 30, 1975.

Claim by Charles I. Holdren against Lease Management, Inc., Michigan Mutual Liability Insurance Company, Lakeside Refining Company and Liberty Mutual Insurance Company for workmen's compensation benefits. Benefits granted. Lakeside Refining Company and Liberty Mutual Insurance Company appeal. Reversed and remanded.

*White, Smitter, Zimmerman & Walters,* for plaintiff.

*Cholette, Perkins & Buchanan* (by *Sherman H. Cone),* for defendants Lakeside Refining Company and Liberty Mutual Insurance Company.

*Hillman, Baxter & Hammond* (by *Paul E. Jensen),* for defendants Lease Management, Inc., and Michigan Mutual Liability Company.

Before: D. E. HOLBROOK, P. J., and BRONSON and M. J. KELLY, JJ.

M. J. KELLY, J. During March of 1971, plaintiff was employed by both Lakeside Refining Company (Lakeside) and Lease Management, Inc. (Lease Management). On March 9, 1971, he sustained an unquestionably compensable industrial injury. The primary issue in this case is whether the injury is attributable to his employment with Lakeside, Lease Management, or both. The workmen's compensation hearing referee found Lakeside liable and ordered compensation accordingly. In a four-to-one decision, the Workmen's Compensation Appeal Board affirmed. Lakeside appeals, contending that at the time of the injury plaintiff was employed only by Lease Management. Alternatively, it is argued that there was joint employment, thereby rendering both employers liable.

Plaintiff worked as an oil field pumper for Lease Management, an oil producing company. His job was to extract the oil from the ground with a pump jack. The oil was pumped into a storage tank where plaintiff would heat it with a gas burner and chemically treat it to separate water from the oil. The water would then be drawn off through a valve on the bottom of the tank, thus

making the undiluted oil marketable. Plaintiff was paid $350 per month by Lease Management for tending six wells. He had no set hours and worked as long as was necessary to complete the work.

Lakeside is an oil refiner which purchases some of its oil from Lease Management. Plaintiff's job for Lakeside was to "gauge" the oil. He was required to make sure that the oil had no more than the acceptable amount of water in it. When he had checked the oil on behalf of Lakeside and found it acceptable, he would call for an oil truck to transport the oil from the field. When the oil was in the truck, he was required to ascertain the amount of oil purchased. He was paid $127.83 by Lakeside for a 44-hour work week.

On March 9, 1971, plaintiff arrived at the site of an oil well in Dorr. The oil in that well was produced by Lease Management for sale to Lakeside. Plaintiff went to the tank and drew off water through the valve. Then, he climbed to the top of the tank and measured the quantity of water in the oil by means of a "thief," a device designed for that purpose. He discovered that the oil was not yet marketable, so he poured in two gallons of treatolite, a chemical used to separate water from oil.

He then lit the heat treater and began to wait. At that time, the gas burner beneath the tank was operating. Five minutes after plaintiff added the treatolite, the tank exploded. He sustained a fractured leg, fractured ribs and burns to the eyes and face. The leg injury was permanent.

Plaintiff testified that at the time of the accident he was waiting for about an hour to elapse so that he could recheck the tank to see if the oil was satisfactory. If so, he intended to call Lakeside and arrange for a tanker to come for the oil. Plaintiff

also testified that the gauger was required to test the oil when requested by the pumper. In essence, he ran the thief in his capacity as a gauger at the request of himself as pumper. He was authorized by Lakeside to conduct the final inspection on that company's behalf.

When plaintiff arrived at the oil field site in Dorr, Michigan, he came in a pickup truck furnished by Lakeside. Lakeside allowed the use of its truck by plaintiff to carry out his duties for Lease Management. When he ascended the tank just prior to the explosion, plaintiff had with him a gauge line and thief belonging to Lakeside. The treatolite and storage tank were owned by Lease Management.

Plaintiff was the only witness who testified on the question of who he was working for at the time of the accident. He felt that at the time he ran the thief he was doing the work of Lakeside. Pouring treatolite into the tank was done on behalf of Lease Management. He also testified:

"*Q.* Is it difficult for you to tell precisely who you were working for when that tank exploded, Mr. Holdren?

"*A.* I was working to the interest of both companies."

* * *

"*Q.* So you did switch hats and did do different jobs in this process?

"*A.* As I said, in my own free mind, I was working at the interest of both companies at the same time. I was doing just as much in Lakeside's favor as I was in Lease Management's."

A cogent discussion delineating the nature of our inquiry is found in 1A Larson, Workmen's Compensation Law, § 48.40, pp 8-253–8-254:

"when a single employee works for two or more employers, an arbitrary two-way classification distinguishing 'joint employment' and 'dual employment' helps to sort out these almost infinitely varied cases.

"Joint employment occurs when a single employee, under contract with two employers, and under the simultaneous control of both, simultaneously performs services for both employers, and when the service for each employer is the same as, or is closely related to, that for the other. In such a case, both employers are liable for workmen's compensation.

"Dual employment occurs when a single employee, under contract with two employers, and under the separate control of each, performs services for the most part for each employer separately, and when the service for each employer is largely unrelated to that for the other. In such a case, the employers may be liable for workmen's compensation separately or jointly, depending on the severability of the employee's activity at the time of injury."

As to the working application of the dual/joint employment dichotomy, 1A Larson, Workmen's Compensation Law, § 48.40, p 8-254 states:

"There has always been a noticeable reluctance on the part of Anglo-American courts to emulate the wisdom of Solomon and decree that the baby be divided in half. Courts are showing an increasing tendency, however, to dispose of close cases, not by insisting on an all-or-nothing choice between two employers both bearing a close relation to the employee, but by finding a joint employment on the theory that the employee is continuously serving both employers under the control of both."

Section 48.50, p 8-266 adds:

"The attempt to subdivide a dual employee's working day and compartmentalize it, moment by moment, into segments belonging to one employer or the other is a

rather artificial and unsatisfying exercise. * * * [The attempt] is not the sort of thing that brings pride to the heart of any lawyer other than the most pedantic antiquarian."

The principles announced have been accepted by our Supreme Court. In *Sargent v A B Knowlson Co,* 224 Mich 686; 195 NW 810 (1923), the employee was a night watchman hired by a number of companies to protect their establishments. One evening Mr. Sargent was in the office of one of his employers when, due to a tragic misunderstanding, he was shot and killed by police who thought he was a burglar. The Supreme Court rejected the attempt to subdivide his working day, saying:

"The petitioning defendants insist that the accident resulting in Sargent's death did not arise out of and in the course of his employment by any defendant except Schornstein. The question presented is, for whom was the deceased working at the time of his death? Under the arrangement made with the several defendants, he was to watch all of their properties. While there was not a joint hiring in the sense that the defendants, or their representatives, got together and jointly engaged the services of the deceased, it is a fact that each of them knew the nature of his employment and that he was rendering a service each night for them all. His employment, therefore, was not several as to each of them. We think they should be held to be co-employers and liable as such. Any other holding would lead to absurd results." 224 Mich 686, 689–690.

The employee in *Wing v Clark Equipment Co,* 286 Mich 343; 282 NW 170 (1938) was hired by Corporations Auxilary Company (Corporations) as an efficiency engineer or undercover man. His job was to work in the Clark Equipment plant and report to Corporations such pertinent information as he came upon. Corporations, in turn, filed its

report with and made recommendations to Clark Equipment. Plaintiff's status was kept secret from other Clark employees while he did general factory work for Clark. In deciding Mr. Wing's employment status, the Supreme Court said:

"Under such circumstances, we think it convincingly appears that plaintiff was serving two employers at the same time. Each had knowledge that the other was a coemployer of plaintiff. *Sargent v. A. B. Knowlson Co.,* 224 Mich. 686 (30 A. L. R. 993). All parties concerned were under the workmen's compensation act. The facts in this case are such that the Clark Equipment Company, if otherwise found to be liable, cannot be relieved of paying compensation under its claim that plaintiff was not in its employ." 286 Mich 343, 349.

In the instant case, it is apparent that plaintiff was a valuable and trusted employee of both employers. Neither directly or intensively supervised his work. For the most part, plaintiff was granted broad discretion and was expected to do the work in the manner he felt appropriate. Both employers knew of and approved of his work for the other.

The absurdity of attempting to compartmentalize plaintiff's work day is apparent in the instant case. Just prior to the accident, he "thiefed" the oil, an act he ascribed to his Lakeside employment. He then added treatolite, an activity purported to be in the interest of Lease Management. Had there been no explosion, plaintiff would have rethiefed for Lakeside. Looking at plaintiff's actions at the precise instant of the explosion, we must conclude that he was standing idly by, a necessary hiatus but one that directly benefitted neither employer. Moreover, the delay was necessarily related to both the preceding act (adding treatolite for Lease Management) and the intended subsequent act (thiefing for Lakeside).

Somehow, even this analysis is illusory because thiefing and adding treatolite were, in reality, in the interests of both employers. By checking the water content, he was performing simultaneously a quality control function for Lease Management and an inspection of oil to be purchased for Lakeside. By adding treatolite, plaintiff was making the oil marketable for the seller and assuring its purity for the buyer. His activity at the time of the accident served to expedite the sale-purchase process on behalf of both.

The fact that both employers approved of plaintiff's employment with the other tends to buttress the conclusion testified to by plaintiff and evident from the other facts. The services of plaintiff at the time of the accident were contemplated by the parties and are in legal effect services on behalf of both employers. In essence, he served as a liaison between the buyer and seller, assuring that their agreement regarding the quantity and quality of the oil was carried out. We hold that plaintiff was jointly employed and the co-employers are each liable for workmen's compensation benefits to plaintiff.

As to the apportionment of compensation between the employers, we again find guidance in *Wing.* There, the Court said:

"The amount of compensation is gauged by the amount of the employee's earnings. This circumstance alone would necessitate separate awards if the respective employers paid unlike amounts for the services of the employee. Such are the facts in the instant case; and there seems to be no good reason why in the administration of the compensation law the department should not make separate awards as to the respective employers." 286 Mich 343, 349–350.

In this respect, Michigan conforms to the rule recited in 1A Larson, Workmen's Compensation Law, § 48.50, p 8-270:

"As to apportionment in these cases, in the absence of some factual reason for varying the fractions an equal sharing may be found appropriate. If the payments made or services received by the two employers were unequal, compensation liability might be adjusted accordingly."

In the instant case, plaintiffs' weekly pay from Lakeside was $127.83. His weekly pay from Lease Management was $80.77 ($350 × 12 ÷ 52). Of plaintiff's total weekly earnings of $208.60, Lease Management paid 38.72 percent and Lakeside paid 61.28 percent. We are of the opinion that the compensation award should be apportioned according to those percentages.

Defendant Lakeside claims that the referee and appeal board erred in determining that plaintiff's children Michael and Pamela were dependents for whom additional compensation would be awarded. At the time of plaintiff's injury, Michael was 17 years of age and Pamela was 18. Both were primarily supported by plaintiff.

For purposes of determining dependency and setting the amount of compensation for total and partial incapacity, the statutory scheme is found at MCLA 418.353; MSA 17.237 (353). In pertinent part, the statute in effect at the time of the accident deemed children under 16 to be conclusively presumed dependents. MCLA 418.353(1)(a)(ii); MSA 17.237 (353) (1)(a)(ii). Non-incapacitated children ceased being dependents on reaching 21. MCLA 418.353(2); MSA 17.237(353)(2). For those between 16 and 21, dependency was a question of fact—whether the child received 1/2 of his support from the injured employee.

By 1971 PA 215, the statute was amended effective December 30, 1971. As amended, children over 18 were not dependents and for those between 16 and 18, dependency was a question of fact. MCLA 418.353; MSA 17.237(353). Thus, claims defendant, Michael and Pamela, who had reached the age of 18 before December 30, 1971, were disentitled to benefits after that date. That claim must fail in light of *Ayres v American Chain & Cable Co,* 56 Mich App 111; 223 NW2d 641 (1974), *lv den,* 393 Mich 784 (1974), which decided the precise issue here raised.

The hearing referee and appeal board found that Lakeside alone was liable and that plaintiff's average weekly wage was $127.83. Therefore, pursuant to the statutory benefit schedule, MCLA 418.351; MSA 17.237(351), plaintiff was awarded the maximum total disability benefits recoverable by an employee with three dependents. On October 1, 1971, plaintiff began working part-time (10 hours per week) for Simons Pipe & Supply Co. Lakeside contended that the Simons employment showed that defendant was only partially disabled and that the $50 weekly earnings should be a credit to the employer.

The hearing referee and appeal board found that the Simons employment did not serve to reduce the benefits recovered from Lakeside. They found that the Simons work was a substitute for the Lease Management work, not the Lakeside work. Hence, the wages received from Simons would not diminish the workmen's compensation benefits until they exceeded $350 per month. Plaintiff, therefore, was held entitled to receive the maximum statutory partial disability benefits. MCLA 418.361; MSA 17.237(361).

On this appeal defendants raise the same issue.

We hold the appropriate pre-accident weekly pay is $208.60, the total of the wages paid by Lakeside and Lease Management, not, as the referee and appeal board held, the $127.83 paid by Lakeside. We hold the Simons earnings to be an allowable credit against the $208.60 weekly wage. When the $50 per week Simons earnings are deducted from the pre-accident pay of $208.60, plaintiff is still entitled to the maximum statutory benefits. Therefore, the issue raised is mooted by our decision that plaintiff was jointly employed.

It is also claimed that the appeal board erred in awarding interest of six percent. This issue has split our Court. In *White v Extra Labor Power of America,* 54 Mich App 370;221 NW2d 214 (1974), we found that five percent was the applicable interest rate. In *Gibbs v Keebler Co,* 56 Mich App 690;224 NW2d 698 (1974), we found six percent to be the proper sum. Our Supreme Court granted leave to appeal in *White,* 393 Mich 795 (1975), and will hopefully resolve that issue. Our decision in the meantime is to allow interest at five percent, same to be amended to read six percent in the event our Supreme Court permits said rate of interest in workmen's compensation cases.

Reversed and remanded for entry of an award in a manner consistent with this opinion.

Costs to plaintiff-appellee to be taxed jointly against both defendants.