ROWELL v SECURITY STEEL PROCESSING COMPANY

RIGGS v MOSSER CONSTRUCTION, INCORPORATED

Docket Nos. 94644, 95000. Argued October 5, 1993 (Calendar Nos. 1-2). Decided June 14, 1994.

Ted Rowell sought worker's compensation benefits for injuries received in the course of his employment with Security Steel Processing Company. A hearing referee granted benefits, determining his average weekly wage to be $346.50. The Worker's Compensation Appeal Board ruled that he actually had worked 7.4 weeks rather than eight weeks and determined his average weekly wage to be $375. The Court of Appeals, WEAVER, P.J., and WAHLS and TAYLOR, JJ., reversed, adopting its earlier opinion in *Tagliavia v Barton Malow Co,* 185 Mich App 556 (1990), which ruled that any week in which wages are earned is to be included in determining the average weekly wage (Docket No. 129065). The plaintiff appeals.

Edward R. Riggs sought worker's compensation benefits for injuries received in the course of his employment with Mosser Construction, Incorporated. A hearing referee granted benefits, finding his average weekly wage to be $603.60. The Worker's Compensation Appellate Commission, following *Tagliavia,* found his average weekly wage to be $316.16. The Court of Appeals, WAHLS, P.J., and SULLIVAN and BRENNAN, JJ., in an unpublished order, denied leave to appeal, citing *Tagliavia* (Docket No. 151717). The plaintiff appeals.

In an opinion by Justice BRICKLEY, joined by Chief Justice CAVANAGH, and Justices LEVIN, BOYLE, GRIFFIN, and MALLETT, the Supreme Court *held:*

In accordance with the overriding purpose of MCL 418.371(3); MSA 17.237(371)(3), to provide for a computation of an average weekly wage that fairly represents an employee's earning capacity as fixed at the time of an injury, in calculating the average weekly wage of an employee who has worked less than thirty-nine weeks, the percentage or fraction of work performed in a partially worked week should be included in the denominator where a week was partially worked because the day of hiring or the day of injury fell during the week.

1. MCL 418.371(3); MSA 17.237(371)(3) is ambiguous in that

the phrase, "the average weekly wage shall be based upon the total wages earned by the employee divided by the total number of weeks actually worked" is susceptible to several possible meanings. Where the language employed by the Legislature is susceptible to more than one interpretation, judicial construction is justified. Thus, when the Legislature employed the phrase "weeks actually worked," it intended total wages earned to be divided by the whole number of full weeks worked plus a fractional number representing the partially worked weeks in question here. Application of this construction leads to a calculation of an employee's average weekly wage that would most closely parallel a mathematical average, and is most consistent with the overall legislative intent expressed in § 371 when read in its entirety.

2. Read together, the provisions of § 371 illustrate that the Legislature attempted to draft a statute that would be sensitive to accuracy as the basis for the determination of weekly wage loss in a variety of employment situations. Treating the partially worked week of hiring and the partially worked week of injury as fractions of a full week comes closest to producing a true average weekly wage. The consideration of these partially worked weeks as fractions in the calculation is fair to both the employee and the employer and is a rational and reasonable interpretation of the statute. It is also consistent with the expressed legislative desire to provide a fair and accurate representation of an injured worker's average weekly wage.

Reversed and remanded.

Justice RILEY, dissenting, stated that MCL 418.371; MSA 17.237(371) does not permit the utilization of fractional work weeks to calculate worker's compensation benefits.

Subsection 3 provides that the average weekly wage is to be based on the total wages earned by the employee divided by the total number of weeks actually worked. Only weeks during which work was performed are to be considered, and any week in which work did not occur is not. Any week in which work occurred is considered a week actually worked. There is no exception for the first, last, or any other partially worked week as long as work is performed that week.

Nowhere in the statutory scheme is there reference to the utilization of fractional work weeks. To the contrary, subsection 3 mandates that the total number of weeks actually worked be utilized to compute a claimant's benefits. While the Legislature clearly articulated computations that account for the exigencies of employment and the untimely halt of employment due to injury, it did not provide for special fractional calculations of

incomplete weeks. Thus, the length or timing of the work week is irrelevant in this case. To conclude that fractional weeks may be the basis for the computation of benefits is nothing more than the unwarranted usurpation of legislative authority.

195 Mich App 578; 491 NW2d 265 (1992).

*Zamler, Mellen & Shiffman, P.C.* (by *Joel Jonas* and *Daryl Royal*), for the plaintiffs in *Rowell.*

*Richard L. Warsh* (*Daryl Royal,* of counsel), for the plaintiff in *Riggs.*

*Conklin, Benham, Ducey, Listman & Chuhran, P.C.* (by *David J. Berge* and *Martin Critchell*), for the defendants in *Rowell.*

*Schellhase, Auld & Johnston* (by *Robert F. Auld* and *Michael J. Mason*) for the defendants in *Riggs.*

BRICKLEY, J. The issue presented in this worker's compensation case is a consideration of the proper treatment under MCL 418.371(3); MSA 17.237(371)(3) of partially worked weeks, specifically the week of hiring and the week of injury, in the computation of an employee's average weekly wage where the employee has worked less than thirty-nine weeks.

We hold that in calculating the average weekly wage, the percentage or fraction of work performed in a partially worked week is to be included in the denominator where a week was partially worked because the day of hiring or the day of injury fell during the week. Such an interpretation is in accordance with the overriding purpose of the section, which is to provide for a computation of an average weekly wage that "fairly represents" the employee's earning capacity as fixed at the time of injury.

I

Ted Rowell was hired as a steel worker. He began his employment with defendant Security Steel Processing Company on Tuesday, April 5, 1983. After finishing out the first week, he then worked six full weeks. His last day of work was Tuesday, May 24, 1983, because of a work-related heart attack. The plaintiff earned $292.50 in his first week of employment, $360 regular pay during each of the intervening six weeks, overtime of $54 in each of two weeks, $67.50 in a third week, and $144 in the week in which he was injured, Rowell's gross wages totaled $2,772.

The hearing referee in *Rowell* followed the approach suggested by the Court of Appeals in *Tagliavia v Barton Malow Co,* 185 Mich App 556; 463 NW2d 116 (1990). The partially worked weeks were treated as whole weeks and used to divide the total wage earned in the course of employment. The average weekly wage was determined to be $346.50. The Worker's Compensation Appeal Board ruled that the "weeks 'actually worked'" were 7.4 weeks rather than 8 weeks and that the average weekly wage was $375.

Riggs was hired as a construction worker. He began his employment with defendant Mosser Construction, Incorporated on Tuesday, December 8, 1987. After finishing out his first week, he then worked one full week. His last day of work was Monday, December 21, 1987, because of a fall from a ladder and resultant back injury. Plaintiff worked twenty-four hours in his first week of employment and twenty-four hours in the following week, earning $399.36 each week. He was injured in the third week of employment, and was paid $149.76 for that week. Riggs' gross wages totaled $948.48.

In *Riggs,* the hearing referee applied the special circumstances exception provided by MCL 418.371(6); MSA 17.237(371)(6). On the basis of a forty hour week, the average weekly wage was $603.60. The Worker's Compensation Appellate Commission, following *Tagliavia,* found that the average weekly wage was $316.16.

The Court of Appeals in *Rowell v Security Steel Processing Co,* 195 Mich App 578; 491 NW2d 265 (1992), adopted as a first-out opinion its earlier decision in *Tagliavia.* We granted leave to appeal, 442 Mich 861 (1993), limited to the issue of the proper interpretation of subsection 371(3) of the Worker's Disability Compensation Act.

In *Riggs v Mosser Construction,* unpublished opinion per curiam, decided September 30, 1992 (Docket No. 151717), the Court of Appeals denied leave to appeal, citing *Tagliavia.* We consolidated and granted leave to appeal with *Rowell,* 442 Mich 903 (1993).

II

Resolution of the correct treatment of the week of hiring and the week of injury, in the context of an employee who has worked less than thirty-nine weeks requires application of MCL 418.371(3); MSA 17.237(371)(3).[1]

When applying any legislation, it must first be

---

[1] The quoted language is from subsection (3) of § 371 of the Worker's Disability Compensation Act. Section 371 in its entirety provides:

(1) The weekly loss in wages referred to in this act shall consist of the percentage of the average weekly earnings of the injured employee computed according to this section as fairly represents the proportionate extent of the impairment of the employee's earning capacity in the employments covered by this act in which the employee was working at the time of the personal injury. The weekly loss in wages shall be fixed as of the time of the personal injury, and determined considering the nature and extent of the personal injury. The compensation

determined whether the language of the statute is clear and unambiguous. *Victorson v Dep't of Treasury,* 439 Mich 131, 138; 482 NW2d 685 (1992).

---

payable, when added to the employee's wage earning capacity after the personal injury in the same or other employments, shall not exceed the employee's average weekly earnings at the time of the injury.

(2) As used in this act, "average weekly wage" means the weekly wage earned by the employee at the time of the employee's injury in all employment, inclusive of overtime, premium pay, and cost of living adjustment, and exclusive of any fringe or other benefits which continue during the disability. Any fringe or other benefit which does not continue during the disability shall be included for purposes of determining an employee's average weekly wage to the extent that the inclusion of the fringe or other benefit will not result in a weekly benefit amount which is greater than 2/3 of the state average weekly wage at the time of injury. The average weekly wage shall be determined by computing the total wages paid in the highest paid 39 weeks of the 52 weeks immediately preceding the date of injury, and dividing by 39.

(3) If the employee worked less than 39 weeks in the employment in which the employee was injured, the average weekly wage shall be based upon the total wages earned by the employee divided by the total number of weeks actually worked. For purposes of this subsection, only those weeks in which work is performed shall be considered in computing the total wages earned and the number of weeks actually worked.

(4) If an employee sustains a compensable injury before completing his or her first work week, the average weekly wage shall be calculated by determining the number of hours of work per week contracted for by that employee multiplied by the employee's hourly rate, or the weekly salary contracted for by the employee.

(5) If the hourly earning of the employee cannot be ascertained, or if the pay has not been designated for the work required, the wage, for the purpose of calculating compensation, shall be taken to be the usual wage for similar services if the services are rendered by paid employees.

(6) If there are special circumstances under which the average weekly wage cannot justly be determined by applying subsections (2) to (5), an average weekly wage may be computed by dividing the aggregate earnings during the year before the injury by the number of days when work was performed and multiplying that daily wage by the number of working days customary in the employment, but not less than 5.

(7) The average weekly wage as determined under this section shall be rounded to the nearest dollar. [MCL 418.371; MSA 17.237(371).]

Where the language of the statute is clear and unambiguous, no judicial interpretation is warranted. *Livonia v Dep't of Social Services,* 423 Mich 466, 487; 378 NW2d 402 (1985).

Contrary to the position taken by the dissent, the language of MCL 418.371(3); MSA 17.237(371)(3) is ambiguous in that the phrase, "the average weekly wage shall be based upon the total wages earned by the employee divided by the total number of weeks actually worked" is susceptible to several possible meanings. One possibility is that the gross wage is to be divided by a whole number that is rounded up whenever an employee performs any work in a week. Another possibility is that the number of weeks in the denominator only reflects weeks in which an employee has actually worked every day. Under this interpretation, partially worked weeks are to be disregarded in the calculation. Total wages are divided by fully worked weeks.

A third possible interpretation would not consider partially worked weeks in either the total wage figure or the number of weeks worked figure. Finally, the interpretation advanced by the plaintiffs suggests that when the Legislature employed the phrase "weeks actually worked," it intended total wages earned to be divided by the whole number of full weeks worked plus a fractional number representing the partially worked weeks.

Where the language employed by the Legislature is susceptible to more than one interpretation, judicial construction is justified. *State Treasurer v Wilson,* 423 Mich 138, 144; 377 NW2d 703 (1985). The goal of statutory construction is to "ascertain and give effect to the intent of the Legislature in enacting the statute." *In re Forfeiture of $5,264,* 432 Mich 242, 248; 439 NW2d 246 (1989). In determining legislative intent, individual

provisions should be considered in conjunction with the entire act. *Arrowhead Development Co v Livingston Co Rd Comm,* 413 Mich 505, 516; 322 NW2d 702 (1982). If the meaning of a statute is unclear, a court must consider the object of the statute and apply a reasonable construction that best accomplishes the Legislature's purpose. *Wilson, supra.* Furthermore, literal constructions that produce unreasonable and unjust results that are inconsistent with the purpose of the act should be avoided. *Salas v Clements,* 399 Mich 103, 109; 247 NW2d 889 (1976).

Under the interpretation advanced by the dissent and the Court of Appeals in *Tagliavia, supra,* the gross wage would be divided by a whole number that rounds up whenever an employee performs any work in a week. In *Tagliavia,* the Court ruled that if wages are earned in any part of a week, that week shall be included as a whole week in determining the average weekly wage. In so concluding, the Court of Appeals reasoned that that result was required by the second sentence of subsection 371(3), which provides:

> For purposes of this subsection, only those weeks in which work is performed shall be considered in computing the total wages earned and the number of weeks actually worked.

We disagree with and disapprove of *Tagliavia.* In directing that only those weeks in which work is performed shall be considered, the Legislature did not direct that every week in which work is performed shall be counted as a whole week without regard to whether the week was fully or partially worked.

Application of the construction suggested by *Tagliavia* would create a downward distortion of

the average weekly wage. For example, the employee who began work on a Friday at the end of a work week, worked one full week and was injured on the following Monday, would effectively have little more than a week's wage divided by three as the basis for compensation.[2] Under the dissent's proposed formula, wages for one week and two days would be treated as if they fairly represented three weeks wages. In contrast, the employee who begins a job on a Monday and is injured three weeks later on a Friday, would see the basis for his compensation almost triple. It seems an absurd notion that the Legislature intended to distinguish between the employee injured on a Monday and the employee injured on a Friday. Because the resultant disparity would be irrational, we conclude that such a result was not the intention of the Legislature.

Similarly, we reject any interpretation of the statute that would disregard the partially worked weeks in question when dividing the gross wage. This would cause an upward distortion of the average weekly wage. For example, the employee discussed previously who began employment on a Friday, worked a full week and is injured the following Monday would have his total wages earned divided by one. This skews the average because the total wage figure would be inflated by the inclusion of two days wages. The result would be unfair to employers and would be inconsistent with the general provisions of subsection 1 regarding fair assessment of average weekly earnings.

While an interpretation of subsection 3 that would totally disregard partially worked weeks in

---

[2] *Chappell v Hall Electric* (Docket No. 95965), is being held in abeyance for the decision in these consolidated cases. Chappell worked one full week without incident, and earned gross wages of $634.40 in that normal work week. He was injured on the second day of the second work week, and earned $253.76 in that week.

either the numerator or the denominator might lead to an equitable solution, the Legislature did not choose the precise words that would lead to that interpretation. The Legislature specifically states that weeks in which work is performed are to be considered. However, the precise words that would lead to the distorted result reached by the dissent are absent. To interpret subsection 3 as rounding partially worked weeks up to the next whole number requires reading the words "any week in which work did occur is considered a week 'actually worked' "[3] into the statute.

It is our conclusion that when the Legislature employed the phrase "weeks actually worked," it intended total wages earned to be divided by the whole number of full weeks worked plus a fractional number representing the partially worked weeks in question here. Application of this construction leads to a calculation of an employee's average weekly wage that would most closely parallel a mathematical average. The employee who was hired to start on a Friday, worked one full week, and was injured on a Monday would have his total wages divided by 1.4 if his work week is based on five working days.[4]

III

This interpretation is most consistent with the overall legislative intent expressed in § 371 when read in its entirety. An examination of the other subsections surrounding subsection 3 reveals the Legislature's overriding desire to have the basis for compensation reflect an accurate measure of

---

[3] *Post,* p 364.

[4] The determination of the number of days customarily worked in a week, which becomes the basis for calculating the fraction of the week partially worked, would be a factual determination to be made by the magistrate.

wages. Section 371(2) establishes that wage is to include overtime, premiums, cost of living adjustments, and any fringe or other benefit that does not continue during the disability.[5] Section 371(2) further provides that where an employee has worked more than thirty-nine weeks before an injury, the highest paid weeks of the fifty-two weeks before the injury are to be the basis for determining wage loss. This reflects a legislative purpose to utilize those weeks that are as fair as possible to the employee when dividing by thirty-nine.

While the Legislature did not specifically address the treatment of the partially worked weeks sub judice when an employee works less than thirty-nine weeks, it did specifically address the employee who worked less than one week. Section 371(4) provides that the basis for determining wage loss for the employee injured during the first week of employment will be a determination of the number of hours the worker was to have worked, multiplied by the hourly rate, or simply the weekly salary.[6]

It would be incongruous for the Legislature to have intended more protection for the employee injured in the first week of employment, under the provisions of subsection 4, than it intended for the employee injured in the second week of employment, under the provisions of subsection 3.

Similarly, § 371(5) provides that where an hourly earning cannot be computed, the usual wage for similar services shall be considered as the basis for calculating compensation.[7] Subsection 6 applies "[i]f there are special circumstances under which the average weekly wage cannot justly be

[5] See n 1 for the text of MCL 418.371(2); MSA 17.237(371)(2).
[6] See n 1 for the text of MCL 418.371(4); MSA 17.237(371)(4).
[7] See n 1 for the text of MCL 418.371(5); MSA 17.237(371)(5).

determined by applying subsections (2) to (5) . . . ."[8] Where there are special circumstances, the Legislature provided that the average weekly wage could be computed by dividing the aggregate earnings by the number of days worked and then multiplying by the number of days customarily worked, "not less than 5." This provision demonstrates that the Legislature was willing to depart from the traditional definition of a work week if necessary to justly determine the basis for compensation.

Read together, the provisions of § 371 illustrate that the Legislature attempted to draft a statute that would be sensitive to accuracy as the basis for the determination of weekly wage loss in a variety of employment situations.

Treating the partially worked week of hiring and the partially worked week of injury as fractions of a full week comes closest to producing a true average weekly wage. The consideration of these partially worked weeks as fractions in the calculation would be fair to both the employee and the employer.

The treatment of these partially worked weeks as fractions is a rational and reasonable interpretation of the statute. It is also consistent with the expressed legislative desire contained in subsection

[8] See n 1 for the entire text of MCL 418.371(6); MSA 17.237(371)(6).

Appellant Riggs included the argument in his application for leave to appeal that subsection 6 should be applied. The magistrate had determined that wage loss should be calculated under subsection 6. The Worker's Compensation Appellate Commission reversed, finding there was no testimony to establish "special circumstances" and instead applied subsection 3, dividing the total wage by a denominator that included the partial week at the beginning of employment and the partial week in which the disabling injury occurred. The Court of Appeals denied application for leave to appeal. This Court's grant of leave to appeal was limited to the issue whether the Worker's Compensation Appellate Commission properly calculated plaintiff's average weekly wage pursuant to MCL 418.371(3); MSA 17.237(371)(3). 442 Mich 903 (1993).

1 to provide for a fair and accurate representation of an injured worker's average weekly wage.

## IV

Therefore, we conclude that the treatment of the partially worked week of hiring and the partially worked week of injury as fractions of full weeks for the purposes of calculating the average weekly wage of an employee with less than thirty-nine weeks of employment best carries out the Legislature's overall intentions for calculating the average weekly wage in this situation.[9]

The judgment of the Court of Appeals is reversed in each case, and the cases are remanded to the Worker's Compensation Appellate Commission for further proceedings.

CAVANAGH, C.J., and LEVIN, BOYLE, GRIFFIN, and MALLETT, JJ., concurred with BRICKLEY, J.

RILEY, J. (*dissenting*). Because MCL 418.371; MSA 17.237(371) does not permit the utilization of fractional work weeks to calculate worker's compensation benefits, I respectfully dissent.

## I

At issue in the instant case is the calculation of worker's compensation benefits due injured workers who work less than thirty-nine weeks but more than a week for their employer before their injury. More specifically, the issue presented is whether

---

[9] This opinion addresses the specific partial weeks presented by both plaintiffs, the week employment commenced and the week of injury. While we do not foreclose the applicability of our interpretation of MCL 418.371(3); MSA 17.237(371)(3) to all other situations presenting partial weeks, we note that application of subsection 3 assumes that fully worked weeks are the norm in the employment the injured worker was performing.

MCL 418.371; MSA 17.237(371) permits the calculation of weekly earnings for worker's compensation benefits by computing the first and last weeks of employment as fractional weeks. The majority holds

> that in calculating the average weekly wage, the percentage or fraction of work performed in a partially worked week is to be included in the denominator where a week was partially worked because the day of hiring or the day of injury fell during the week. Such an interpretation is in accordance with the overriding purpose of the section, which is to provide for a computation of an average weekly wage that "fairly represents" the employee's earning capacity as fixed at the time of injury. [*Ante* at 349.]

II

A

Contrary to the method utilized by the majority, I begin by examining the language employed by the Legislature to resolve this issue. MCL 418.371; MSA 17.237(371) provides:

> (1) The weekly loss in wages referred to in this act shall consist of the percentage of the average weekly earnings of the injured employee computed according to this section as fairly represents the proportionate extent of the impairment of the employee's earning capacity in the employments covered by this act in which the employee was working at the time of the personal injury. The weekly loss in wages shall be fixed as of the time of the personal injury, and determined considering the nature and extent of the personal injury. The compensation payable, when added to the employee's wage earning capacity after the personal injury in the same or other employments, shall not

exceed the employee's average weekly earnings at the time of the injury.

(2) As used in this act, "average weekly wage" means the weekly wage earned by the employee at the time of the employee's injury in all employment, inclusive of overtime, premium pay, and cost of living adjustment, and exclusive of any fringe or other benefits which continue during the disability. Any fringe or other benefit which does not continue during the disability shall be included for purposes of determining an employee's average weekly wage to the extent that the inclusion of the fringe or other benefit will not result in a weekly benefit amount which is greater than 2/3 of the state average weekly wage at the time of injury. The average weekly wage shall be determined by computing the total wages paid in the highest paid 39 weeks of the 52 weeks immediately preceding the date of injury, and dividing by 39.

(3) If the employee worked less than 39 weeks in the employment in which the employee was injured, the average weekly wage shall be based upon the total wages earned by the employee divided by the total number of weeks actually worked. For purposes of this subsection, only those weeks in which work is performed shall be considered in computing the total wages earned and the number of weeks actually worked.

(4) If an employee sustains a compensable injury before completing his or her first work week, the average weekly wage shall be calculated by determining the number of hours of work per week contracted for by that employee multiplied by the employee's hourly rate, or the weekly salary contracted for by the employee.

(5) If the hourly earning of the employee cannot be ascertained, or if the pay has not been designated for the work required, the wage, for the purpose of calculating compensation, shall be taken to be the usual wage for similar services if the services are rendered by paid employees.

(6) If there are special circumstances under which the average weekly wage cannot justly be

determined by applying subsections (2) to (5), an average weekly wage may be computed by dividing the aggregate earnings during the year before the injury by the number of days when work was performed and multiplying that daily wage by the number of working days customary in the employment, but not less than 5.

This Court has long held that "[i]n every exposition of a statute, the intention of the Legislature is undoubtedly the end to be sought . . . ." *Leoni Twp v Taylor,* 20 Mich 148, 154-155 (1870). Because the Legislature is presumed to understand the meaning of the language it places into law, "[s]tatutory analysis necessarily begins with the wording of the statute itself." *Carr v General Motors Corp,* 425 Mich 313, 317; 389 NW2d 686 (1986). Each word of an act is "presumed to be made use of for some purpose," and "so far as possible, effect must be given to every clause and sentence." *Univ of Michigan Bd of Regents v Auditor General,* 167 Mich 444, 450; 132 NW 1037 (1911). Accordingly, the Court may not substitute or redefine a word. *People v Crucible Steel Co of America,* 150 Mich 563, 567; 114 NW 350 (1907). Nor may the Court assume that a mistake was made or that the Legislature inadvertently utilized one word instead of another. *Detroit v Redford Twp,* 253 Mich 453, 456; 235 NW 217 (1931).[1] Moreover, unless the statute or circumstances dictate otherwise, the Court should utilize the common understanding of words and phrases. *People ex rel Platt v Oakland Co Bank,* 1 Doug 282, 287

---

[1] See also *People v Crucible Steel Co of America, supra* at 567 ("We cannot assume the legislature made a mistake and used one word when it in fact intended to use another. The language of the statute is plain as it reads and we do not feel authorized to change its meaning by substituting another word for the one the legislature used"); *Stowers v Wolodzko,* 386 Mich 119, 133; 191 NW2d 355 (1971) ("Every word should be given meaning and no word should be treated as surplusage or rendered nugatory if at all possible").

(Mich, 1844).[2] Hence, "[a] fundamental principle guiding this Court is that a clear and unambiguous statute leaves no room for judicial construction or interpretation." *Coleman v Gurwin,* 443 Mich 59, 65; 503 NW2d 435 (1993).[3] In other words, "[a] statute is not open to construction as a matter of course, but only where the language used in the statute requires interpretation—where it is ambiguous or where 2 or more constructions can be placed upon it, where it is of such doubtful or obscure meaning that reasonable minds might be uncertain or disagree as to its meaning." *City of Lansing v Lansing Twp,* 356 Mich 641, 649; 97 NW2d 804 (1959).

These rules of statutory construction are especially appropriate in the instant case:

> "The compensation act is in derogation of the common law and, therefore, its measure of relief may not be extended beyond its express terms; it is a legislative creation permitting no enlargement by principles of equity or common-law adaptations. It is arbitrary and where it speaks nothing can be added nor changed by judicial pronouncement. It imposes liability upon operatives under its provisions and measures exclusive relief in its own terms." [*Solakis v Roberts,* 395 Mich 13, 20; 233

---

[2] Justice COOLEY elaborated:

There are certain well settled rules for the construction of statutes, which no court can safely disregard. Where the statute is plain and unambiguous in its terms, the courts have nothing to do but to obey it. They may give a sensible and reasonable interpretation to legislative expressions which are obscure, but they have no right to distort those which are clear and intelligible. The fair and natural import of the terms employed, in view of the subject matter of the law, is what should govern . . . . [*People ex rel Twitchell v Blodgett,* 13 Mich 127, 167-168 (1865).]

See also MCL 8.3a; MSA 2.212(1).

[3] See also *People v Plumsted,* 2 Mich 465, 469 (1853); *In re Forfeiture of $5,264,* 432 Mich 242, 248; 439 NW2d 246 (1989).

NW2d 1 (1975), quoting *Tews v C F Hanks Coal
Co,* 267 Mich 466, 468-469; 255 NW 227 (1934).]

B

Subsection 3 provides that "the average weekly
wage shall be based upon the total wages earned
by the employee divided by the total number of
weeks actually worked." The subsection defines,
for its purposes only, that "only those weeks in
which work is performed shall be considered in
computing the total wages earned and the number
of weeks actually worked." Accordingly, any week
in which work did not occur is not considered in
the calculation, while any week in which work did
occur is considered a week "actually worked."
There is no exception for the first, last, or any
other partially worked week as long as "work is
performed" that week. In the instant case, there-
fore, each plaintiff's wages should be divided by
the total number of weeks in which at least some
work occurred, regardless of the actual hours
worked or wages earned each week. This subsec-
tion is uncomplicated and provides for a readily
determinable weekly wage. The fairness of the
provision is not our concern.

The majority, however, ignores the clear mean-
ing of the statute and substitutes a standard fash-
ioned from whole cloth. Nowhere in the statutory
scheme is there reference to the utilization of
fractional work weeks. To the contrary, the subsec-
tion at issue mandates that the "total number of
weeks actually worked" be utilized to compute a
claimant's benefits. The ordinary meaning of this
phrase is to interpret "week" as seven consecutive
days (beginning on Sunday) and "total number of
weeks" to mean the combined or full number of

weeks that work occurred. "[W]eeks actually worked" is specifically defined as any week in which work is performed. Contrary to the majority's holding, the subsection does not provide that shortened weeks at the beginning and end of a worker's employment are to be computed as fractions—the statutory definition of "actually worked" does not differentiate between shortened and full work weeks or between the first, middle, and last weeks of employment. In fact, no mention of first or last weeks exists in the section at issue whatsoever. Nor is there a provision for partially worked weeks. The section clearly provides that the total number of weeks in which any work was performed—regardless of the amount of work performed or when the week was worked—is to be used in the calculation. In short, there is no provision for the utilization of fractional weeks for the first and last weeks worked.

The majority, however, posits that the language is ambiguous by proffering four different interpretations of the language at issue, *ante* at 353, and then chooses the one interpretation it finds the most palatable. Yet, three of these interpretations are simply untenable distortions of language of the statute. The true objection of the majority, is that the clear language of the statute is "unfair." *Ante* at 355. This Court, however, may not misinterpret statutes so that they may seem more fair to its individual members.

If the Legislature wished to ensure that fractional weeks be utilized, it would have clearly expressed that intention. For example, subsection 3 explicitly provides that weeks during which no work occurred are not to be counted as weeks for the purpose of determining compensation. Similarly, subsection 4 provides for special calculations if an employee is injured before completing the

first work week "by determining the number of
hours of work per week contracted for by that
employee multiplied by the employee's hourly
rate, or the weekly salary contracted for by the
employee." Similarly, subsection 6 defines a week
for its purposes as "the number of working days
customary in the employment . . . ." The Legisla-
ture, therefore, has clearly articulated computa-
tions that account for the exigencies of employ-
ment and the untimely halt of employment due to
injury. Nevertheless, the Legislature did not pro-
vide for special fractional calculations for incom-
plete weeks, calculations by multiplying the con-
tracted hours by the hourly wage, or weeks "cus-
tomary in the employment" in subsection 3. The
majority, however, examines the separate subsec-
tions to support its conclusions that the Legisla-
ture intended its formula. To the contrary, the
Legislature's purposeful decision not to include
such special calculations reveals that it intended
otherwise. In short, the length or timing of the
work week is irrelevant in the instant case. The
language utilized is not so doubtful or obscure that
reasonable minds might be uncertain of its mean-
ing. Indeed, the language could not be clearer. The
majority simply engrafts on the statute a novel
means of computing benefits in contradiction with
its plain terms.

The majority protests that "[i]n directing that
only those weeks in which work is performed shall
be considered, the Legislature did not direct that
every week in which work is performed shall be
counted as a whole week without regard to
whether the week was fully or partially worked."
*Ante* at 354. To the contrary, the Legislature
clearly provided that any week in which work
occurred was to be considered a week "actually
worked." The majority's interpretation has the

anomalous result of counting partially worked
weeks at the beginning and the end of employ-
ment as fractions, but counting weeks partially
worked in between the first and last week as a full
week. Thus, a week "actually worked" possesses
two entirely different definitions for the same
worker at the same job. Such a reading is nothing
if not "incongruous" or "absurd."

Contrary to the majority, we must assume that
the Legislature intended to choose the precise
words it utilized, and that it consciously chose not
to utilize fractional weeks in the subsection at
issue. We must not substitute the Legislature's
words for our preferences. The Legislature enacted
this language with the passage of 1980 PA 357.
The act completely revised the prior statutorily
mandated calculation by eliminating the calcula-
tion of wages by "multiplying the hourly rate or
earning by the average number of hours
worked . . . ."[4] The extensive alteration engen-
dered by the act, carefully crafted a model for
calculating the appropriate benefits to a claimant
in the specific circumstances of an employee in-
jured before completing thirty-nine weeks of em-
ployment. Like all legislation, the provision at
issue was a legislative compromise. The majority
undoes that compromise by amending the statute
via judicial fiat. The Legislature did not find it fit
to modify the statute—neither should this Court.

When confronted with an unambiguous statute,

[4] Before the enactment of 1980 PA 357, subsection 3 provided:

   When a hearing referee finds that the employee was em-
   ployed specifically and not temporarily on a part-time basis, the
   average weekly wage shall be determined by multiplying the
   hourly rate or earning by the average number of hours worked
   in the part-time employment. When it is found that the em-
   ployee has worked an average of 25 hours or more per week in
   all of his current employments, he shall not be considered a
   part-time employee.

we are not to find metaphysical and subtle meanings hidden between or behind the language of the statute. This case is not one about the justice or injustice of the statute involved. The majority bases its holding on the possible unfairness that might result from the application of the clear language. Yet, within our system of separate powers, the lawmaking function resides with the Legislature, not this Court. *Roosevelt Oil Co v Secretary of State,* 339 Mich 679, 694; 64 NW2d 582 (1954) ("it is not the function of the court to legislate"). Thus, unless proven unconstitutional, "[t]he wisdom of the provision in question in the form in which it was enacted is a matter of legislative responsibility with which courts may not interfere." *Melia v Employment Security Comm,* 346 Mich 544, 561; 78 NW2d 273 (1956). "Adherence to the language and legislative intent of a statute is essential to ensure that 'courts . . . declare the sense of the law' and do not 'exercise will instead of judgment . . . .' Hamilton, *The Federalist Papers,* No 78, Kramnick, ed (England: Penguin Books, 1987 [originally published in 1788]), p 440." *Coleman, supra* at 65. In other words, as a court of law, we do not create law or base opinions on questions of policy or our personal feelings. To the contrary, when construing a statute, our objective must only be to discern the Legislature's intent. The majority's conclusion that fractional weeks may be the basis for the computation of benefits, therefore, is nothing more than the unwarranted usurpation of legislative authority—the exercise of will instead of judgment.